Filed 11/29/22

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM JOSEPH CANNON,<br><br>        Defendant and Appellant. | A163083<br><br>(Mendocino County<br>Super. Ct. No.<br>    SCUK-CRCR-2010-14869-2) |

Defendant William Joseph Cannon appeals from a postjudgment commitment order in a proceeding under the Sexually Violent Predator Act (SVPA or Act) (Welf. & Inst. Code, § 6600 et seq.).[1]  Defendant challenges this commitment order on three grounds: (1) the lack of substantial evidence to support the trial court's finding that he qualified as a sexually violent predator (SVP), (2) the admission of prejudicial hearsay expert testimony, and (3) the violation of his constitutional right to equal protection based on the court's failure to advise him of his right to a jury trial and to obtain his personal waiver of this right.  We agree with defendant this matter should be

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I and II of the discussion.

[1] Unless otherwise stated, all statutory citations are to the Welfare and Institutions Code.

remanded to the trial court to provide him an opportunity to raise his equal protection challenge. We otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. *Defendant's 2010 Criminal Conviction.*

On December 16, 2010, defendant was convicted by plea of assault with intent to commit rape and dissuading a witness. On March 15, 2011, defendant was sentenced to a total term of seven years, representing the four-year middle term on the assault count, running consecutively to the three-year middle term on the dissuading count.

According to the stipulated basis for the plea,[2] on October 3, 2010, defendant, wearing a face mask, grabbed the victim, Jane Doe, and attempted to drag her off the street to sexually assault her. As Jane struggled, defendant warned he would " 'F'ing kill her' " if she called the police. Jane, assisted by two bystanders, was able to escape. Defendant ran away but was later apprehended by police. During his subsequent police interview, defendant admitted that he was out that day " 'hunting females to sexually assault them.' " He also admitted that when he grabbed Jane, he intended to drag her to a secluded area to rape her but was thwarted by two passersby.

### II. *2016 Petition to Commit Defendant Under the SVPA.*

On August 30, 2016, the district attorney filed a petition to commit defendant under the SVPA. On October 3, 2016, after the parties submitted on expert reports prepared by Drs. Sanders and Miculian, the trial court made a finding of probable cause.

---

[2] This stipulation was subsequently admitted into evidence in defendant's SVPA trial.

Defendant's SVPA trial was subsequently continued several times, and the court ordered new evaluation reports. The updated evaluations were prepared in 2018, revealing a split in opinion among the experts as to whether defendant qualified as an SVP.

On February 7, 2018, at a pretrial conference unattended by defendant, his counsel waived his right to a jury trial.

## III.   *Defendant's 2020 SVPA Bench Trial.*

Following several additional continuances, defendant's bench trial began October 5, 2020.

### A.   Investigator Kevin Bailey.

Investigator Kevin Bailey, who interviewed[3] defendant after his October 2, 2010 arrest, testified for the prosecution. Defendant told Bailey about two traumatic brain injuries that preceded his crimes. In 2007 and again in 2009, defendant suffered traumatic injury to the prefrontal lobes of his brain. In the first incident, defendant fell from a roof while on a trip to Guatemala. He lost consciousness. Afterward, defendant became obsessed with sex and began consuming large amounts of pornography.

Defendant's behavioral changes caused conflict with his family, who sent him to Utah to live with his aunt. In 2009, while living there, defendant was hit by a truck while riding his bike. This second injury enhanced defendant's obsessions with sex and pornography and increased his sexual disinhibition. Soon, his aunt had enough and defendant went to live with his grandfather. Defendant's grandfather also became overwhelmed with defendant's sexual tendencies, and he eventually went to live with a coworker. This coworker then forced defendant to leave after defendant made sexually inappropriate comments to his wife.

---

[3] A recording of this interview was admitted into evidence.

Defendant acknowledged to Bailey that following his injuries, he "made some pretty irrational decisions . . . ." For example, defendant got into trouble with his college administration after getting caught viewing pornography in the library. After Bailey confronted defendant with his camera, defendant acknowledged there was a video on it that he made of himself masturbating.

Defendant also pursued a relationship with his 15-year-old next-door neighbor. Initially, the pair developed a mutual interest. However, defendant "just got kind of aggressive with her . . . ." One night, defendant entered her home through an unlocked window and attempted to "lure her out" to have sex. His conduct scared the young girl, and her mother told him to stay away. However, defendant returned one day to the girl's home and tried unsuccessfully to enter through a door. Defendant acknowledged to Bailey that had the door been unlocked, he "might've [pulled her out of the house and] raped her . . . ." Instead, the girl's mother called the police and obtained a restraining order against him.

Later, defendant began hunting girls to have sex with, ultimately finding and attempting to rape the 16-year-old victim that was the subject of his arrest. As defendant told Bailey, he acquired a backpack in which he carried a hat and mask that he intended to use to commit rape. For about a week prior to his crime, he went out "just looking for a girl that was walking by." Asked to explain, defendant said, "I mean I guess, um, I have like sexual urges." Defendant added that he formulated a plan to commit rape if the opportunity presented itself, even though his conduct was "wrong" and would harm his victim. "Maybe it was a bad time or something."

Defendant also told Bailey that on the day of his crime, he went to church carrying his bag packed with a hat, mask, and a pen, which he hoped

4

to use to dupe his prospective victim into thinking he had a knife. Defendant's plan was to force his victim into a "darkened area," show her the pen/faux weapon, "cover her mouth," "push her down," "drop her pants" and "force her" "[t]o have sex with me." When Bailey asked what he would have been willing to do to avoid getting caught, defendant responded, "I guess maybe as far as it'll take." While his plan only included rape, defendant admitted, "I guess in some way probably [he was prepared to kill his victim if necessary]."

Defendant left church within minutes and began walking around. He "happened to see this girl" who appeared to be about 16 years old. Defendant made sure he could put on his mask "without kinda being seen by other people" before running toward the girl from behind. Defendant was surprised at how quickly he closed in on her without attracting her attention. However, soon after defendant grabbed the girl, a car stopped and two people got out. Had that not happened, defendant admitted, "I probably would have had sex with the girl and taken her down, um, down into the shed, done my business and tried to shut her up, I guess." Asked how far he would have gone if the girl had threatened to call the police, defendant responded, "I mean like I said, I never thought about killing someone, but I suppose maybe in the moment, it's possible, yes. I suppose it could happen."

B. **Expert Witnesses.**[4]

Three expert psychologists, each of whom evaluated defendant several times, also testified at trial. Drs. Karlsson and Miculian, appearing for the prosecution, opined that defendant met the qualifications for an SVP and, as

---

[4] The expert testimony is the subject of several issues raised on appeal. Accordingly, the relevant testimony is discussed in much greater detail *post* (pp. 9–12).

5

such, needed to stay in custody under treatment (pp. 9–11, *post*).  Dr.
Dempsey, in turn, testified for the defense that defendant no longer qualified
as an SVP and should be released to pursue outpatient treatment
(p. 12, *post*).

## IV.   *The Commitment Order and Appeal.*

On December 15, 2020, the trial court issued a written order finding
that the prosecution met its burden to prove that defendant qualified as an
SVP.  Accordingly, defendant was committed to the State Department of
State Hospitals–Coalinga (Coalinga) for an indefinite term.  Defendant's
timely appeal followed.

## DISCUSSION

Defendant contends the trial court's commitment order must be
vacated because (1) the prosecution failed to prove beyond a reasonable doubt
that he was an SVP; (2) the court erroneously admitted expert testimony
consisting of case specific hearsay; and (3) his constitutional right to equal
protection was violated by the court's failure to advise him of his right to a
jury trial or to elicit his personal waiver of this right.  We address each issue
in turn *post*.

## I.   *The prosecutor proved defendant was an SVP beyond a reasonable doubt.*

The SVPA provides for the indefinite civil commitment of a convicted
sexual offender upon completion of his or her prison term if, after trial, he or
she is found beyond a reasonable doubt to be an SVP.[5]  (§ 6600 et seq.; *People*

---

[5] The process for determining whether an offender is an SVP, including
whether he or she has a diagnosed mental disorder making him or her a
danger to the health and safety of others (§ 6600, subd. (a)(1)), takes place in
several stages, both administrative and judicial.  (*Hubbart v. Superior Court*
(1999) 19 Cal.4th 1138, 1145.)  Here, we are concerned with the
determination that defendant is an SVP, made by the trial judge acting as

6

*v. Williams* (2003) 31 Cal.4th 757, 764.) "The purpose of the SVPA is to use a civil commitment to treat SVP's for their current mental disorders and to reduce the threat of harm otherwise posed to the public. [Citation.] No punitive purpose was intended. (Stats. 1995, ch. 763, § 1.)" (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1152.)

An offender qualifies as an SVP for purposes of the Act if he or she "has been convicted of a sexually violent offense against one or more victims and . . . has a diagnosed mental disorder that makes [him or her] a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) A " '[d]iagnosed mental disorder' " is "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).)

Thus, under the SVPA, the prosecutor must prove beyond a reasonable doubt that the offender (1) has been convicted of a sexually violent offense; (2) has a diagnosed mental disorder; (3) as a result of this mental disorder, is a danger to the health and safety of others in that he or she is likely to engage in acts of sexual violence; and (4) it is necessary to keep him or her in a secure facility to ensure others' safety. (*People v. Superior Court* (*George*) (2008) 164 Cal.App.4th 183, 194–195; CALCRIM No. 3454.) Here, defendant contends the prosecution did not meet its burden as to the third and fourth prongs of this standard.

---

trier of fact after a trial on the People's commitment petition. (§§ 6602, 6604.)

7

## A.	Standard of Review.

Where a defendant challenges the sufficiency of the evidence supporting his or her commitment under the Act, courts apply the same test that applies in reviewing the sufficiency of the evidence supporting a criminal conviction.  (*People v. McCloud* (2013) 213 Cal.App.4th 1076, 1088.)  Accordingly, we examine the entire record in the light most favorable to the commitment order to determine whether it contains substantial evidence from which the trier of fact could find the underlying facts true beyond a reasonable doubt.  (*People v. Johnson* (1980) 26 Cal.3d 557, 576–577.)  "Substantial evidence" means " ' "evidence which is reasonable, credible, and of solid value . . . ." ' " (*People v. Maury* (2003) 30 Cal.4th 342, 396 (*Maury*).)

As the reviewing court, we accept all logical inferences the trier of fact might have drawn from the evidence, both direct and circumstantial.  (*Maury, supra*, 30 Cal.4th at p. 396.)  "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*Id*. at p. 403.)  Ultimately, it is the trier of fact, not the appellate court, that must be convinced of the findings beyond a reasonable doubt.  " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Bean* (1988) 46 Cal.3d 919, 933.)

## B.     Evidentiary Record.

### 1.     *Prosecutorial Experts.*

The prosecution presented testimony from two forensic psychologists with the State Department of State Hospitals, Drs. Karlsson and Miculian, to opine on defendant's qualifications as an SVP.

Dr. Karlsson had completed over 500 SVP evaluations for the State Department of State Hospitals.  Dr. Karlsson evaluated defendant in 2017 and again in 2019.  Both times, he diagnosed defendant with major or mild neurocognitive disorder due to traumatic brain injury.  Further, Dr. Karlsson opined in 2019 that defendant remained a "likely risk" to engage in sexually violent predatory conduct due to his diagnosed mental disorder unless he remained in custody to complete his sex offender treatment program.  While defendant had been actively engaged in this program, he had not yet completed it.

In reaching these opinions, Dr. Karlsson evaluated defendant with several actuarial instruments designed to assess a person's risk factors associated with sexual reoffending.  Defendant scored a five on the Static-99 instrument, placing him in the above average group of offenders:  14–17 percent likely to reoffend within five years based on various static factors.  Based on the SRA-FV instrument, which considers dynamic factors, defendant fell within the "routine group of sex offenders."  However, Dr. Karlsson identified defendant as an "outlier" in that neither the Static-99 nor the SRA-FV instrument was designed for people, such as defendant, with a frontal lobe brain defect.  In Dr. Karlsson's opinion, due to the nature of defendant's injury, his recidivism rate was, in fact, higher (greater than 15 percent) compared to his reference sex offender group.

One of Dr. Karlsson's primary concerns in reaching this opinion was defendant's current use of pornography at Coalinga and his preference for pornography depicting sexually naïve young women ages 18 to 20, which defendant labeled the " 'school-girl type.' " This demographic closely matched that of defendants' victims. To Dr. Karlsson, this fact indicated defendant had not yet matured in his sexual interests.

Of further concern was defendant's admission to Dr. Karlsson that he used pornography while in custody to cope with his sexual urges. Yet, defendant acknowledged in 2017 that pornography had been a trigger for committing his offenses and that, if released, he would need to avoid it.

In addition, defendant had not yet completed the final two modules of his treatment program. In the final two modules, defendant would have the opportunity to learn and practice tools for dealing with his triggers in the community that might otherwise increase his chance of recidivism. Due to defendant's brain injury, Dr. Karlsson opined that defendant required more time to absorb the treatment materials and engage in individualized treatment (including "neuro-rehab") before being released. Until defendant completes "the entire [sex offender treatment] program at Coalinga," he would not be ready for release.

Lastly, Dr. Karlsson acknowledged defendant had not acted out sexually in the last three years and had progressed in therapy. However, he cautioned defendant remained emotionally impaired due to his injury. And, while defendant is "doing really well when he's in a structured environment like Coalinga," it is not yet clear that he would have the same success in an uncontrolled environment.

Dr. Miculian, a psychologist with the State Department of State Hospitals who had conducted over 1,000 SVP evaluations,[6] evaluated defendant in 2016, 2017 and 2019. He diagnosed defendant each time with major mental neurocognitive disorder due to a traumatic brain injury, one aspect of which "could be an inability to control one's sexual impulses."

Similarly to Dr. Karlsson, Dr. Miculian opined defendant was likely to reoffend if released. Dr. Miculian identified two major risk factors that increased the likelihood of his reoffending: (1) "spending time with teenagers whom he thought looked older than they were" and (2) regularly looking at pornography. At Coalinga, defendant continued to watch pornography three to four times weekly for one to two hours, which Dr. Miculian found very problematic. Dr. Miculian also identified as risk factors defendant's lack of any long-term intimate relationship and his poor problem-solving ability due to his injury. Thus, while "[defendant is] less of a risk than he was in 2010 . . . , still he's a serious well-founded risk given the nature of his disorder." Similarly to Dr. Karlsson, Dr. Miculian assigned defendant a score of five on the Static-99 test, placing him in the above average group for reoffending.

Lastly, Dr. Miculian opined that defendant continued to have impulse control issues, explaining, "[T]here's going to be issues with understanding social situations and persistence and not being apathetic." As such, "[defendant] still continues to need to be in custody so he can persist through more parts of treatment before he is released. I anticipate that after he gets through the treatment in the hospital, that he will comply with the requirements when he is released."

_____

[6] Dr. Miculian had reached negative diagnoses in about 92 percent of his evaluations.

### 2. *Defense Expert.*

Dr. Dempsey, a forensic neuropsychologist, testified for the defense and disagreed with many of the opinions and methods of Drs. Karlsson and Miculian. Dr. Dempsey agreed with Drs. Karlsson and Miculian that defendant scored a five on the Static-99 test and, as such, was an above average risk for reoffending. Similarly, her dynamic testing placed defendant at moderate risk for committing another sexual offense. Yet, while defendant was still in the moderate range for reoffense with regard to static and dynamic factors, Dr. Dempsey opined that "with regard to neuropsychological factors he's in a much lower range."

Dr. Dempsey, who first evaluated defendant in 2011 in prison, was "astounded" with his improvement when she reevaluated him in 2019. She still diagnosed defendant with neurocognitive disorder for head injury "because he still does have . . . some deficits." However, based on several neuropsychological tests, Dr. Dempsey found defendant significantly less impaired in executive areas of functioning that included inhibition, impulse control, cognitive flexibility and perseveration. While defendant was not fully healed, he tested in the average range in 2019, while previously "he was in the borderline and impaired levels . . . ."

Dr. Dempsey also disagreed with Dr. Karlsson's decision to "override" his clinical testing in order to assign defendant a higher rate of recidivism based on his injury. According to Dr. Dempsey, his opinion failed to account for the fact defendant's brain had healed significantly in the past few years. Dr. Dempsey believed that defendant was no longer volitionally impaired and that his use of porn was "healthy" and not a fixation. Defendant would "do well" in outpatient treatment, in part because he had a stable family life and a large peer group and was intellectually functioning prior to his injury.

### C. Substantial evidence proved defendant was likely to reengage in acts of sexual violence.

Based on this record, we reject defendant's contention that the prosecution failed to prove beyond a reasonable doubt that, due to his diagnosed mental disorder, he was likely to reoffend.

Under the Act, an offender cannot qualify as an SVP "based on prior offenses absent relevant evidence of a currently diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(3).) However, the statute "does not require proof of a recent overt act while the offender is in custody." (*Id.*, subd. (d).)[7] For purposes of the SVPA, the phrase " '*likely* to engage in acts of sexual violence' (italics added), as used in section 6601, subdivision (d), . . . requires a determination that, as the result of a current mental disorder which predisposes the person to commit violent sex offenses, he or she presents a *substantial danger*—that is, a *serious and well-founded risk*—of reoffending in this way if free." (*People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 916 (*Ghilotti*);

---

[7] The SVPA also contains " 'provisions for the evaluations to be updated or replaced after the commitment petition is filed in order "to obtain up-to-date evaluations, in light of the fact that commitment under the SVPA is based on a 'current' mental disorder." ' [Citation.]" (*In re Butler* (2020) 55 Cal.App.5th 614, 628.) "After commitment, an SVP is evaluated every year to consider 'whether the committed person currently meets the definition of a sexually violent predator and whether conditional release to a less restrictive alternative, pursuant to Section 6608, or an unconditional discharge, pursuant to Section 6605, is in the best interest of the person and conditions can be imposed that would adequately protect the community.' (§ 6604.9.) Under certain circumstances, an SVP may petition the court for either conditional release (§ 6608) or unconditional discharge (§ 6605)." (*In re Butler*, at pp. 628–629.)

13

*People v. Williams, supra*, 31 Cal.4th at p. 772 [" 'there must be proof of *serious difficulty* in controlling behavior' "].)

Here, all three experts testified defendant had a qualifying mental disorder and posed an above average or moderate risk of reoffending based on various actuarial instruments, including the Static-99, SRA-FV and Stable-2007. The two prosecution experts, Drs. Karlsson and Miculian, further agreed defendant remained likely to reoffend if released before completing his treatment program. They found it particularly troublesome that defendant continued to view pornography three or four times a week for one to two hours at a time and that he preferred the " 'school-girl type,' " meaning sexually inexperienced young women. Defendant's victims were similarly young in age, and he acknowledged that viewing porn contributed to his predatory behavior. Dr. Karlsson and Dr. Miculian's shared opinion, supported by the record, constitutes substantial evidence that defendant currently presents a serious and well-founded risk of reoffending. (*Ghilotti, supra*, 27 Cal.4th at p. 916.)

In so concluding, we acknowledge defense expert, Dr. Dempsey, disagreed with Drs. Karlsson and Miculian and insisted defendant was no longer volitionally impaired. However, this issue was resolved against defendant by the court, acting as trier of fact. It is not our role on appeal to reweigh or reinterpret the experts' testimony. (*People v. Mercer* (1999) 70 Cal.App.4th 463, 466–467 ["the jury could reasonably believe the evidence of the prosecution witnesses and reject that of the defense witness [that defendant could not control his sexually violent behavior and would likely reoffend if released]"].) Reading the relevant testimony in a light favorable to the trial court's judgment as the law requires (*ibid*.), there is no cause to favor Dr. Dempsey's opinion over theirs.

14

We also acknowledge defendant's point that neither prosecution expert was an expert in the field of neuropsychology, as was Dr. Dempsey. Based on this fact, defendant argues the prosecution failed to offer admissible evidence that he was currently neurocognitively impaired, leaving undisputed Dr. Dempsey's testimony that he was *not* currently neurocognitively impaired. This argument confuses our legal standard. The SVPA required proof that defendant currently had a diagnosed mental disorder. (§ 6600, subd. (a)(1).) There is no dispute that he did. However, the SVPA did not require proof that he was currently *neurocognitively* impaired. (See *People v. Williams, supra*, 31 Cal.4th at p. 773 [" 'the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law' "].)

Accordingly, for the reasons stated, we affirm the trial court's finding that defendant currently presented a serious and well-founded risk of reoffending if released from custody. (*Ghilotti, supra*, 27 Cal.4th at p. 916.)

### D. Substantial evidence proved it was necessary to keep defendant in custody to ensure the health and safety of others.

Defendant contends substantial evidence also failed to support the court's finding that it was necessary to keep him in custody to ensure the health and safety of others. Defendant's argument is based primarily on his "track record" in the hospital of not committing any sexually unacceptable acts. This argument fails for several reasons.

First, as stated *ante*, the SVPA "does not require proof of a recent overt act while the offender is in custody." (§ 6600, subd. (d).) Second, notwithstanding the lack of evidence of any recent sexual misconduct, our record contains substantial evidence supporting the court's finding that

15

defendant required further in-custody treatment before he could be safely released into the community.  (See CALCRIM No. 3454.)

Dr. Karlsson testified defendant's continued porn use, with a preference for "the schoolgirl-type," was concerning because he "had sex offenses in the past with a certain kinds of girls that he has interest in.· To me, this shows that he hasn't really moved on maturely into woman in his own age." (*Sic*.)  In Dr. Karlsson's opinion, defendant also required individualized treatment to address his particular traumatic brain injury, which hindered him from absorbing his treatment materials.  And, both Dr. Karlsson and Dr. Miculian opined defendant needed to complete the third and fourth modules of his treatment program in order to learn necessary tools for dealing with his "triggers" once he leaves the institutional setting.  Without doing so, defendant's impulsivity remained a concern.

Finally, there was evidence defendant had, in the past, declined to participate in certain aspects of his treatment, once because he deemed it unnecessary and another time because he preferred to sleep in.  Dr. Dempsey dismissed these incidents.  Nonetheless, a "patient's refusal to cooperate in any phase of treatment may therefore support a finding that he 'is not prepared to control his untreated dangerousness by voluntary means if released unconditionally to the community.' " (*People v. Sumahit* (2005) 128 Cal.App.4th 347, 354–355.)

Defendant interprets the record as showing that Drs. Karlsson and Miculian preferred he remain in custodial treatment, not that it was necessary.  (See *Ghilotti, supra*, 27 Cal.4th at p. 929 [the SVPA does not require an individual "to complete a prescribed program of treatment under the Director's supervision in order to be eligible for outright release"].)  Defendant also notes the prosecution's failure to offer a neurological

16

assessment that "could constitute substantial evidence that custodial treatment was necessary."

Defendant again misconstrues our standard. As stated, we draw all reasonable inferences in favor of the court's judgment. (*People v. Mercer, supra*, 70 Cal.App.4th at pp. 466–467.) Viewed in this light, we reasonably interpret Dr. Karlsson's and Dr. Miculian's testimony to support the finding that due to defendant's diagnosed mental disorder, he currently presents "a *serious and well-founded risk* . . . of criminal sexual violence unless maintained in an appropriate custodial setting which offers mandatory treatment for the disorder." (*Ghilotti, supra*, 27 Cal.4th at p. 895.) The fact that Dr. Dempsey opined defendant would "do well" in outpatient treatment does not alter our conclusion. The trial court was entitled to reject this position. (*Mercer, supra*, at p. 467.)

Thus, we conclude defendant's failure to complete treatment, considered in light of his ongoing pornography use and the nature of his mental disorder and its impact on his volitional capacity, provides substantial evidence that he will, if released, "represent a substantial danger of committing similar new crimes . . . ." (*Ghilotti, supra*, 27 Cal.4th at p. 924, italics omitted.)

## II. *The court did not erroneously admit expert testimony that included case-specific hearsay.*

Defendant next contends the trial court erred by admitting Dr. Karlsson's testimony regarding "conclusions purportedly reached by neuropsychologist Dr. Dinishak after he evaluated [defendant]." He relies on *People v. Sanchez* (2016) 63 Cal.4th 665, which held: "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that

17

the statements are not being admitted for their truth." (*Sanchez, supra*, 63 Cal.4th at pp. 686, 670; see Evid. Code, § 801, subd. (b).) An expert therefore "*cannot* . . . relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Sanchez*, at p. 686.)

Whether a trial court erred in admitting hearsay expert testimony in violation of *Sanchez* is reviewed for abuse of discretion. (*Bennett v. Superior Court* (2019) 39 Cal.App.5th 862, 876.) Under this standard, the trial court's ruling will not be disturbed " ' " 'unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*People v. Rogers* (2013) 57 Cal.4th 296, 326.) Trial court error that rests on an error of law is an abuse of discretion. (*Bennett*, at p. 876.)

Here, defendant points to two supposedly problematic statements during Dr. Karlsson's testimony. First, Dr. Karlsson testified on direct examination that "various neuropsychological tests . . . suggest[] that [defendant] still has various kinds of impairments," a consideration Dr. Karlsson factored into his evaluation. Then, on cross-examination, Dr. Karlsson confirmed that he relied on Dr. Dinishak's neuropsychological testing, and that Dr. Dinishak, in his 2017 assessments, "discuss[ed] [defendant's] impairments and [found] him apparently more impaired than Dr. Dempsey." We find neither error nor prejudice.

Under the SVPA, state evaluators such as Dr. Karlsson are called upon to conduct updated evaluations of the offender, which "shall include review of available medical and psychological records, including treatment records, consultation with current treating clinicians, and interviews of the person being evaluated, either voluntarily or by court order." (§ 6603, subd. (d)(1).)

This rule is consistent with standard rules of evidence. Evidence Code section 801, subdivision (b) allows an expert to render an opinion "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." Evidence Code section 802, in turn, allows an expert to "state on direct examination the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion."

Here, Dr. Karlsson complied with these statutory rules in reviewing Dr. Dinishak's test findings, along with defendant's other medical records, as part of his evaluation. (§ 6603, subd. (d)(1).) Dr. Karlsson also confirmed that his own opinions regarding defendant were based on his analysis of all the information that he reviewed, including defendant's treatment records and test findings. As such, Dr. Karlsson did not run afoul of *Sanchez*. (*People v. Leon* (2015) 61 Cal.4th 569, 603 ["testimony relating the testifying expert's own, independently conceived opinion is not objectionable, even if that opinion is based on inadmissible hearsay. . . . The hearsay problem arises when an expert simply recites portions of a report prepared by someone else"].)

Moreover, the record reflects that the trial court excluded and struck any reference to the results of Dr. Dinishak's neuropsychological testing on the grounds that it was a case-specific fact. This ruling reflects that the court

19

was well aware of the *Sanchez* rule. And, even aside from this ruling, the law requires that we presume the trial court properly performed its judicial duty, including its duty while acting as trier of fact to " ' "ignore material it knows is incompetent, irrelevant, or inadmissible." [Citation.] "Only proof that the evidence actually figured in the court's decision will overcome these presumptions. [Citations.] Clearly, the mere fact that the court heard or read the evidence is not sufficient to overcome the presumptions." ' " (*People v. Presley* (2021) 65 Cal.App.5th 1131, 1143.) Defendant points to nothing in the record indicating the trial court violated this rule.

## III.  *Equal Protection Challenge.*

Last, defendant contends his constitutional right to equal protection was violated by the court's failure to advise him of his right to a jury trial or to elicit his personal waiver of this right. Defendant reasons (1) he is similarly situated to defendants facing involuntary civil commitment as a mentally disordered offender (MDO) (Pen. Code, § 2960 et seq.) and those who plead not guilty by reason of insanity (NGI) (Pen. Code, § 1026.5), yet (2) he is treated less favorably than those groups because commitment under the SVPA does not require the personal waiver of a jury trial.

"Decisions by this court and the United States Supreme Court . . . have used the equal protection clause to police civil commitment statutes to ensure that a particular group of civil committees is not unfairly or arbitrarily subjected to greater burdens." (*People v. McKee* (2010) 47 Cal.4th 1172, 1199 (*McKee I*) [collecting cases].) Relevant here, the SVPA affords an offender facing involuntary civil commitment the right to a jury trial. (§ 6603, subd. (a).) However, "[i]f the person subject to this article or the petitioning attorney does not demand a jury trial, the trial shall be before the court without a jury." (§ 6603, subd. (f).) Thus, there is no requirement that the

offender personally waive his or her right to a jury trial after being advised by the court of the implications of doing so. (*People v. Washington* (2021) 72 Cal.App.5th 453, 463 (*Washington*) ["the SVPA does not contain language requiring a jury trial advisement or a personal waiver of that right, evincing a legislative intent not to provide these procedural protections"].)

In contrast, an offender facing involuntary civil commitment under either the MDO or the NGI statute is entitled to a jury trial *unless* he or she, having been advised by the court of this right, personally waives it. (Pen. Code, §§ 2972, subd. (a)(1) ["court shall advise the person of the right to be represented by an attorney and of the right to a jury trial"], (a)(2) ["trial shall be by jury unless waived by both the person and the district attorney"], 1026.5, subd. (b)(3)–(4) [same].) Thus, as reflected in the statutory language, "the Legislature intentionally established a different framework for a defendant's exercise of his or her right to a jury trial in an SVP proceeding, creating a presumption that the trial would be by the court unless demanded by the defendant." (*Washington, supra*, 72 Cal.App.5th at p. 468.) The question raised is whether this legislative distinction violates defendant's equal protection rights.

## A. No Forfeiture.

We first address the People's threshold argument that defendant forfeited his equal protection challenge by failing to bring it below. Several courts have rejected this argument based on reasoning with which we agree. While a constitutional right may be forfeited if not timely asserted in the lower court (*People v. McCullough* (2013) 56 Cal.4th 589, 593), we have discretion to consider the claim on the merits if it presents a pure question of law and it is unclear whether the appellant had the opportunity to raise the argument below. (*In re Sheena K.* (2007) 40 Cal.4th 875, 887, fn. 7.)

21

Such is the case here. Defendant's equal protection challenge raises a pure question of law, and it does not appear he had the opportunity to raise it below. (See *People v. Nolasco* (2021) 67 Cal.App.5th 209, 217 (*Nolasco*) [exercising discretion to consider equal protection challenge to statute for civil commitment of developmentally disabled individual "because it presents an important question of public concern"]; *People v. Magana* (2022) 76 Cal.App.5th 310, 321 (*Magana*).) As the *Washington* court aptly explained: "Although Washington's attorney failed to argue that Washington was entitled to a jury trial absent a personal waiver by Washington after a jury trial advisement, it is hard to envision how counsel could have asserted this claim. . . . The only way Washington could have asserted an equal protection challenge in the trial court would have been for his attorney to request the trial court advise Washington of his right to a jury trial and take a personal waiver of that right. Then, if the court declined to do so based on the absence of a requirement in the SVPA, Washington's attorney could have argued not doing so would violate equal protection principles. But presumably, Washington's attorney believed Washington wanted to proceed with a court trial (which may or may not have been the case), and thus, counsel would have been unlikely to demand the court advise Washington of his jury trial right and take a personal waiver. Yet had the civil commitment proceeding been under the MDO or NGI statutes, the court would have been required to advise Washington of his right to a jury trial and to take his personal waiver of that right, to ensure he was aware of and making a knowing, intelligent, and voluntary waiver of that right. Under these unusual circumstances, we decline to find forfeiture . . . ." (*Washington, supra*, 72 Cal.App.5th at pp. 473–474.)

22

Similarly to the *Washington* court, we presume defense counsel reasonably believed defendant wished to waive his right to a jury trial and, as such, reasonably believed it was unnecessary to demand that the trial court advise him of his jury trial rights before raising an equal protection claim. (*Conservatorship of John L.* (2010) 48 Cal.4th 131, 156–157 ["in the absence of any contrary indication, the superior court may assume that an attorney is competent and fully communicates with the proposed [committee] about the entire proceeding"]; *People v. Ngo* (1996) 14 Cal.4th 30, 37 [an attorney admitted to the California State Bar is presumptively competent].) Under these circumstances, the forfeiture doctrine should not apply.

### B. Equal Protection Principles.

"The constitutional guaranty of equal protection of the laws means simply that persons similarly situated with respect to the purpose of the law must be similarly treated under the law. [Citations.] If persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold. [Citation.] The question is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' [Citation.]" (*People v. Buffington, supra*, 74 Cal.App.4th at p. 1155.)

"Where classes of persons are similarly situated, '[t]he extent of justification required to survive equal protection scrutiny in a specific context depends on the nature or effect of the classification at issue.' " (*Magana, supra*, 76 Cal.App.5th at p. 322.)

### C. Equal Protection Analysis.

The People concede SVP's are similarly situated to MDO's and NGI's for purposes of the jury trial laws in question. (*McKee I, supra*, 47 Cal.4th 1172, 1203 ["MDO's and SVP's are similarly situated for our present

purposes"]; *Magana, supra*, 76 Cal.App.5th at p. 322.) Accordingly, we turn directly to whether the state has "some justification for this differential treatment." (*McKee I*, at p. 1203.) The first step is deciding the appropriate level of scrutiny of the state's proposed justification.

"Because of the fundamental interests at stake, equal protection principles are often invoked in civil commitment cases to ensure that the statutory scheme applicable to a particular class of persons has not treated them unfairly in comparison with other groups with similar characteristics." (*People v. Barrett* (2012) 54 Cal.4th 1081, 1107 (*Barrett*).) Yet, decisions from the Courts of Appeal have reached differing conclusions about the level of scrutiny appropriate for assessing distinct claims of disparate treatment in civil commitments. (Compare *Nolasco, supra*, 67 Cal.App.5th at pp. 222–225 [applying rational basis in the context of developmental disability commitment but acknowledging that "the law in this area appears to be in a state of flux"] and *People v. Buffington, supra*, 74 Cal.App.4th at p. 1156 ["Strict scrutiny is the correct standard of review in California for disparate involuntary civil commitment schemes because liberty is a fundamental interest"].)

The common understanding is: "In ordinary equal protection cases not involving suspect classifications (such as race) or the alleged infringement of a fundamental interest (such as the right to vote or to pursue a lawful occupation), these legislative distinctions are upheld if they have a rational relationship to a legitimate state purpose. [Citation.] If the distinction, however, involves a suspect classification or infringes on a fundamental interest, it is strictly scrutinized and is upheld only if it is necessary to further a compelling state interest. . . . ([Citation]; *Hubbart v. Superior Court, supra*, 19 Cal.4th at p. 1153, fn. 20.)" (*People v. Buffington, supra*, 74

Cal.App.4th at pp. 1155–1156.) As one court recently noted, rational basis scrutiny is " 'exceedingly deferential: A law will be upheld as long as a court can "speculat[e]" any rational reason for the resulting differential treatment, regardless of whether the "speculation has 'a foundation in the record,' " regardless of whether it can be "empirically substantiated," and regardless of whether the Legislature ever "articulated" that reason when enacting the law.' [Citation.]" (*Nolasco, supra*, 67 Cal.App.5th at pp. 209, 220–221.) Strict scrutiny, on the other hand, requires the state to prove it has "a compelling interest that justifies the law and that the distinctions, or disparate treatment, made by that law are necessary to further its purpose. (*Warden v. State Bar* (1999) 21 Cal.4th 628, 641 [citations].) Alternatively stated, applying the strict scrutiny standard, a law "is upheld only if it is necessary to further a compelling state interest. [Citation.]" (*People v. McKee* (2012) 207 Cal.App.4th 1325, 1335 (*McKee II*).)

Several courts have recognized that, while civil commitments in general implicate an individual's fundamental liberty interest, not all legislative enactments involving civil commitments directly impact this liberty interest. On the one hand, courts have considered equal protection challenges to civil commitment statutes governing who had the burden of proof when the committed individual seeks release, and have found strict scrutiny appropriate. (E.g., *McKee II, supra*, 207 Cal.App.4th at p. 1348 [applying strict scrutiny review to reject defendant's equal protection challenge to the SVPA provision placing the burden on the committed person to prove he or she should be released, where the MDO provision provided for a one-year commitment after which release was automatic unless the People proved beyond a reasonable doubt the person should be recommitted for another year].) On the other hand, courts have considered equal protection

25

challenges to civil commitment statutes relating, as here, to secondary or ancillary trial procedures that do not necessarily impact the individual's fundamental rights. Under these circumstances, rational basis review was applied. (*Magana, supra*, 76 Cal.App.5th at p. 324 ["Although the indefinite commitment of an alleged SVP affects the individual's fundamental right to liberty, ensuring an alleged SVP has meaningful access to the statutory right to a jury trial, while essential to the exercise of that right, does not affect a fundamental right"]; *Nolasco, supra*, 67 Cal.App.5th at p. 225.)

In *Barrett*, similar to here, the California Supreme Court addressed the equal protection challenge of an intellectually disabled person to the Legislature's failure to expressly authorize jury trials or require jury trial advisements in civil commitment proceedings under section 6500. (*Barrett, supra*, 54 Cal.4th at pp. 1088–1089.) Applying the rational basis standard of review, the court rejected the defendant's claim that equal protection principles required that section 6500 proceedings involve the same jury trial safeguards that apply under the Lanterman-Petris-Short Act (§ 5000 et seq.) to proceedings in which confined patients posing a " 'demonstrated danger' as a result of 'mental disorder or mental defect' " faced 180 days of civil commitment. (*Barrett, supra*, 54 Cal.4th at pp. 1106, 1111, fn. 21.) The court's majority reasoned: "Contrary to what Barrett implies, she has not been singled out for harsh and unfair treatment in this regard. Of the nine commitment procedures we have listed above, a majority (including § 6500 et seq.) either do not reference jury trial matters at all (such that a right to jury trial on request has been constitutionally implied), or they say nothing about advisements or waivers of any jury trial right otherwise provided therein. By the same token, variations in the other commitment schemes suggest no uniform set of jury trial procedures exists or was withheld from

Barrett. There is nothing unusual or unconstitutional about the manner in which these statutes have evolved over time." (*Id*. at p. 1110, fns. omitted; accord, *McKee I, supra*, 47 Cal.4th at pp. 1210, fn. 13 ["we strongly disagree with the concurring and dissenting opinion's characterization of our view as being 'that every detail of every civil commitment program is subject to strict scrutiny' "], 1223 (conc. & dis. opn. of Chin, J.) ["A person may have a fundamental interest in his or her liberty, but I question whether this fundamental interest extends to all procedures whereby decisions involving personal liberty are made. . . . [C]ourts from other states that have considered the question have overwhelmingly concluded that strict scrutiny does not apply to equal protection challenges to civil commitment programs"].)[8]

We agree with our appellate colleagues in *Magana* and *Nolasco* that *Barrett*, and its use of the rational basis standard, governs our case.

---

[8] The *McKee I* court held that "when certain due process protections for those civilly committed are guaranteed by statute, even if not constitutionally required, the denial of those protections to one group must be reasonably justified in order to pass muster under the equal protection clause." (*McKee I, supra*, 47 Cal.4th at p. 1207.) The court then remanded the case for the trial court to decide in the first instance whether the People "can demonstrate the constitutional justification for imposing on SVP's a greater burden than is imposed on MDO's and NGI's in order to obtain release from commitment." (*Id*. at pp. 1208–1209.) In doing so, the court cited *In re Moye* (1978) 22 Cal.3d 457, 465–466, which applied the strict scrutiny standard to an equal protection challenge based on the less favorable treatment afforded NGI's as compared to MDO's with respect to the statutory commitment period and burden of proof. (*McKee I*, at pp. 1208–1209.) The *McKee I* court did not expressly hold that the strict scrutiny standard should apply on remand. One appellate court that analyzed *McKee I* concluded that the *McKee I* court in fact applied "a form of 'heightened scrutiny' that appears to be less rigorous than strict scrutiny but more onerous than rational basis scrutiny." (*Nolasco, supra*, 67 Cal.App.5th at pp. 224–225.)

27

(*Magana, supra*, 76 Cal.App.5th at p. 324; *Nolasco, supra*, 67 Cal.App.5th at p. 225 ["we choose to . . . apply rational basis scrutiny—because *Barrett* is the most recent pronouncement by our Supreme Court as to the pertinent level of scrutiny to apply when comparing divergent civil commitment procedures"].) However, in doing so, we do not suggest that the rights to a jury trial advisement and personal jury trial waiver are only marginally significant or that the rational basis standard is toothless.  As powerfully explained by Justice Liu in his *Barrett* concurrence/dissent:  "Whether or not an advisement alters the ultimate choice to proceed with or without a jury, it expresses the legal system's respect for the individual as a participant in, and not a mere object of, the commitment proceedings.  For those who are capable of understanding it, an advisement by the court recognizes their dignity as well as their ability to comprehend and possibly participate in an important aspect of a proceeding that may adversely and irreversibly shape the rest of their lives.  Having extended this recognition to some persons with mental [disorders], the Legislature must have an actual, considered rationale for not extending it to others." (*Barrett, supra*, 54 Cal.4th at p. 1149 (conc. & dis. opn. of Liu, J.).)

With this in mind, we return to the record to determine whether it contains a constitutional justification for the state's failure to grant SVPA defendants the same rights to a jury advisement and personal jury trial waiver as the MDO and NGI statutes.  Because defendant did not raise his equal protection claim below, the People were unaware of the need to make this showing in the appropriate venue.  Nonetheless, the People identify two possible rationales in their respondent's brief for this legislative difference: (1) the Legislature could have determined that SVP's as a class pose a greater safety risk to society than MDO's or NGI's, warranting weaker jury trial

28

rights; and (2) the Legislature could have determined "an alleged SVP's right to a fair trial would be best protected by a judge indisputably capable of examining such highly inflammatory evidence in an impartial [manner]" rather than a jury.[9]

Neither rationale is sufficient for purposes of rational basis review. First, as aptly stated by our appellate colleagues in *Washington* and *Magana*, "[W]e have difficulty seeing how the dangerousness of an SVP would justify denying an alleged SVP the procedural protections for the right to a jury trial afforded other civil committees, especially given the significant liberty interests at stake for an alleged SVP facing a potential indefinite commitment." (*Washington, supra*, 72 Cal.App.5th at p. 474 [distinguishing *McKee II*, wherein the reviewing court affirmed the trial court's finding that the People had met their burden to show SVP's pose a greater danger to society than MDO's and NGI's, thereby justifying differential treatment as to the commitment term and burden to obtain release from commitment]; *Magana, supra*, 76 Cal.App.5th at p. 352.)

Moreover, given the central role of the jury trial in our legal system, we also have difficulty accepting that our Legislature would deem it necessary or appropriate to discourage jury trials in order to protect an alleged SVP's access to a fair trial. In defendant's words, "[s]uch a cynical view of juries is

_____

[9] The People rely on the fact that the SVPA expressly provides that if a jury trial is demanded, "[j]urors shall be admonished that they may not find a person a sexually violent predator based on prior offenses absent relevant evidence of a currently diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(3).) According to the People, this jury admonishment requirement "reflects legislative awareness that a judge might approach an SVP case more objectively and dispassionately than a jury given the subject matter at issue—a sexually violent offense."

29

contrary to the long line of authority holding that the right to a jury trial is 'fundamental to the American scheme of justice.' (See, e.g., *Ramos v. Louisiana* (2020) __ U.S. __ [140 S.Ct. 1390, 1397].)"

However, while rejecting these arguments, we nonetheless conclude in light of defendant's delay in raising his equal protection claim that remand is necessary to give the People a meaningful opportunity to demonstrate a valid constitutional justification for the SVP's differential legislative treatment. (See *McKee I, supra*, 47 Cal.4th at pp. 1208–1210; see also *Magana, supra*, 76 Cal.App.5th at p. 324.) There may indeed be differences between individuals facing commitment under the SVPA and individuals facing commitment under the MDO/NDI statutes that warrant categorical distinctions among these groups with respect to these jury trial rights. (See *Barrett, supra*, 54 Cal.4th at p. 1110 ["an equal protection violation does not occur merely because different statutory procedures have been included in different civil commitment schemes"].) Given the importance of this issue, we decline to decide it on an incomplete factual record. In the meantime, we conditionally affirm the trial court's order declaring defendant to be an SVP and committing him to the State Department of State Hospitals for an indeterminate term.

### D. Any error would not be harmless.

Last, we reject the People's claim that remand is not necessary because any failure of the trial court to advise defendant of his rights to a jury trial and to obtain a personal waiver of this right was harmless error.

The *Magana* court, relying on *Blackburn* (2015) 61 Cal.4th 1113, 1134–1136, held that a trial court complying with a statutory jury trial waiver requirement would commit reversible error unless the record affirmatively showed a valid waiver. (*Magana, supra*, 76 Cal.App.5th at p. 327; *Blackburn,*

30

*supra*, at p. 1136 ["trial court's failure to properly advise an MDO defendant of the right to a jury trial does not by itself warrant automatic reversal. Instead, a trial court's acceptance of a defendant's personal waiver without an express advisement may be deemed harmless if the record affirmatively shows, based on the totality of the circumstances, that the defendant's waiver was knowing and voluntary"].)  Because the record there was silent on the issue, the *Magana* court reversed and remanded to the trial court to litigate the defendant's equal protection claim.  (*Magana*, at p. 327.)

The same circumstances exist here.  The record reflects that, on February 7, 2018, the trial court asked whether either side wished to waive a jury trial, even though the SVPA did not require the court to make this inquiry.  In response, defense counsel waived a jury trial on defendant's behalf, and the court accepted it.  At a subsequent pretrial conference on March 22, 2018, which defendant did not attend, defense counsel "confirm[ed] it is a court trial, not a jury trial," before adding defendant was "wavering if he even wants to come to court at this point."

Nothing in this record affirmatively demonstrates that defendant was fully advised of his rights to a jury trial or that he made a knowing and intelligent waiver of such right.  To the contrary, he was not present when his counsel offered a waiver on his behalf.  As such, following *Blackburn* and *Magana*, we decline to find harmless error on a silent record and, instead, remand to the trial court to litigate defendant's constitutional challenge.

## DISPOSITION

The order declaring defendant to be an SVP and committing him to the State Department of State Hospitals for an indeterminate term is conditionally affirmed.  The matter is remanded to the trial court to provide defendant an opportunity to raise his equal protection challenge to the

31

SVPA's jury trial provisions.  If, on remand, the trial court determines there is an equal protection violation, the court shall vacate the order declaring defendant to be an SVP and set the matter for a jury trial unless, after a full advisement by the court, he knowingly and intelligently waives his right to have a jury decide his case.

 

 

_____

Jackson, P. J.

WE CONCUR:

_____

Simons, J.

_____

Burns, J.

A163083/*People v. William Joseph Cannon*

A163083/People v. Cannon

Trial Court:        Superior Court of the County of Mendocino

Trial Judge:        Ann Moorman

Counsel:        Jeremy Price and Rachel Belden, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Assistant Attorneys General, Arlene A. Sevidal and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.